**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**F I L E D**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

OCT 2 4 2013

JEFFREY P. COLWELL
CLERK

Civil Action No. 1:13-cv-01553-WYD-MEH

MALIBU MEDIA, LLC,

      Plaintiff,

v.

DEAN KUGA,

      Defendant

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Defendant, Dean Kuga, pursuant to Fed. R. Civ. P. 12(b)(6), moves for the entry of an order dismissing the Amended Complaint filed by Plaintiff Malibu Media, LLC and states:

### FACTS

Plaintiff Malibu Media claims that Defendant Dean Kuga "willfully" performed 18 counts of alleged copyright infringements of Plaintiff's copyrights listed in Exhibit B of Plaintiff's complaint, using what Plaintiff describes as "BitTorrent File Distribution Network". Plaintiff claims that Plaintiff's investigator IPP Limited established a "direct TCP/IP connection" with "Defendant's IP address", "downloaded from Defendant one or more bits of each of the digital movie files identified by the file hashes on Exhibit A", and verified that the file hashes match the items listed in Exhibit A of Plaintiff's complaint. Plaintiff further claims that the most recent TCP/IP connection between IPP Limited and "Defendant's IP address" for each file hash listed on Plaintiff's Exhibit A is included within the column labeled Hit Date UTC. Plaintiff also claims that IPP Limited engaged in "enhanced surveillance" of other digital media files allegedly distributed by the Defendant and provides results of this "more intensive surveillance" in

1

its Exhibit C. Plaintiff's Exhibit C also contains a column labeled Hit Date UTC which allegedly shows when these other digital media files, not copyrighted by the Plaintiff, were allegedly distributed by the Defendant. Finally, Plaintiff claims that "As the subscriber in control of the IP address being used to distribute Plaintiff's copyrighted movies, Defendant is the most likely infringer." and alleges that the Defendant is consequently the infringer.

Defendant denies all allegations and denies that Plaintiff has any cause(s) of action against Defendant under the United States Copyright Act of 1976 or under any other legislation.

## ARGUMENT

**I. Dynamic IP address is a temporary numeric identification that can change at any time and the IP address in question was leased to the defendant's account only during the 16 days of the 7 month period covered by Plaintiff's complaint.**

Plaintiff's copyright infringement complaint is supported by a single piece of evidence; a fact that on 05/04/2013 at 16:28:59 GMT dynamic IP address 75.70.54.187 (dynamic IP addressing is explained in **Exhibit A**) was assigned to defendant's account with his ISP[1] Comcast. This is the only information obtained by the Plaintiff from Defendant's ISP Comcast via the subpoena issued by this court. However, one of the most important characteristics of dynamic IP Addresses leased (assigned) to home subscribers by Internet Service Providers is that these are temporary and can be changed at any moment in time with lease length[2] typically ranging from days to several months[3]. Plaintiff therefore made a misinformed (or calculated) assumption that the IP Address in question was assigned to the defendant throughout the 7 month period during which these alleged copyright infringement(s) involving the aforementioned IP Address occurred. This assumption was made without having the

---

[1] Internet Service Provider
[2] The length of time a dynamic IP address is assigned to a subscriber
[3] As stated by the members of Comcast Legal Response Center and clear from Exhibit A

actual knowledge if the IP Address in question was indeed assigned to the defendant throughout this period and it resulted in a large number of alleged copyright infringements and Plaintiff's Exhibit C with large number of items described by the Plaintiff as "enhanced surveillance of other digital media files being distributed by Defendant" submitted by the Plaintiff with a sole purpose of attempting to shame and intimidate the defendant into early settlement. This assumption also resulted in appearance of a strong case set forth by the Plaintiff.

This assumption was, however, very much wrong, considering that the IP address in question was leased to the Defendant only during the 16 days of this 7 month period covered by Plaintiff's complaint. Defendant's official IP History provided by Defendant's ISP Comcast and attached to this motion as **Exhibit B** clearly shows that IP address 75.70.54.187 was leased to Defendant on 04/19/2013 08:53:53 UTC, column labeled "Lease Grant (UTC)", and this lease expired approximately three months later on 07/11/2013 17:09:59 UTC. This eliminates any possibility that the 17 of 18 alleged copyright infringements involving this IP address occurred during the time it was leased to the Defendant, shows clearly that IP address can change at any time and raises serious questions about validity of Plaintiff's evidence, methods of surveillance and overall claims. It also means that the vast majority of items in Plaintiff's Exhibit C could not have possibly been downloaded via IP in question while this IP was assigned to the Defendant rendering Plaintiff's Exhibit C moot since its stated purpose was to show a pattern of alleged file sharing and copyright infringement over an extended period of time and the time period during which the IP address in question was assigned to the defendant is reduced to less than a month by the defendant's IP history.

**II As part of its prima facie copyright claim, Plaintiff must show that Defendant copied the copyrighted work. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).**

As ruled by Judge Otis Wright of United States District Court Central District of California (Case 2-12-cv-08333-ODW-JC), downloading "one or more bits of a digital movie" as described by Plaintiff in paragraphs 17, 19 and 20 of its complaint, is no evidence that the download was completed even if the IP address in question was used, by party other than the defendant or users authorized by the defendant, at the time(s) provided by the Plaintiff to upload one or more bits of a digital movie to Plaintiff's investigator IPP Limited.

Here is a quote from Judge Otis Wright's ruling:

"This snapshot allegedly shows that the Defendants were downloading the copyrighted work—at least at that moment in time. But downloading a large file like a video takes time; and depending on a user's Internet-connection speed, it may take a long time. In fact, it may take so long that the user may have terminated the download. The user may have also terminated the download for other reasons. To allege copyright infringement based on an IP snapshot is akin to alleging theft based on a single surveillance camera shot: a photo of a child reaching for candy from a display does not automatically mean he stole it. No Court would allow a lawsuit to be filed based on that amount of evidence."

Therefore, by downloading "one or more bits of a digital movie" from a device utilizing the IP in question Plaintiff failed to show that the party utilizing the IP in question copied the copyrighted work in full, and consequently, that the copyright infringement(s) actually occurred.

**III. IP address provides only the location at which one of any number of computer devices may be deployed; much like a telephone number can be used for any number of telephones. Thus, it is no more likely that the subscriber to an IP address carried out a particular computer function than to say an individual who pays the telephone bill made a specific telephone call. Unlike the telephone, however, internet enabled devices utilizing an IP address can very easily be compromised by a remote attacker and utilized to generate unauthorized internet traffic.**

In addition to being temporary, dynamic IP addresses leased by Internet Service Providers are also typically used to generate internet traffic by multiple people in household, household guests, visiting family members and other authorized users. However, as it will be clearly demonstrated in this motion, internet traffic going through an IP address can also be very easily generated by unauthorized users either by unauthorized use of defendant's wireless network by individual(s) in close enough proximity to defendant's wireless router device, or by remote attackers exploiting one of many operating system and network vulnerabilities in order to place malicious software on computers legitimately utilizing this IP address for internet access which would allow these remote attacker to perform any computer function on these infected computers including but not limited to generating any type of internet traffic (**Exhibit C** shows that defendant's ISP indeed detected that malicious software was present on defendant's computer at the time that the single alleged copyright infringement, while the IP in question was leased to defendant's account, allegedly took place). Recognizing these facts, Judge Gary Brown of the United States District Court Eastern District of New York (Case 2:11-cv-03995-DRH-GRB), Judge Harold Baker of the United States District Court for the Central District of Illinois (Case 2:11-cv-02068-HAB –DGB) and others, effectively ruled that an IP address is not a person and that it is not sufficient evidence to identify copyright infringers. According to Judge Brown this lack of specific evidence means that many alleged copyright infringers have been wrongfully accused by copyright holders. In his recommendation order the Judge labels BitTorrent

lawsuits a "waste of judicial resources." For a variety of reasons he recommends other judges to reject similar cases in the future. Here are some of the more pertinent quotes from that ruling:

"The assumption that the person who pays for Internet access at a given location is the same individual who allegedly downloaded a single sexually explicit film is tenuous, and one that has grown more so over time,".

"An IP address provides only the location at which one of any number of computer devices may be deployed; much like a telephone number can be used for any number of telephones."

"Thus, it is no more likely that the subscriber to an IP address carried out a particular computer function – here the purported illegal downloading of a single pornographic film – than to say an individual who pays the telephone bill made a specific telephone call."

The Judge continues by arguing that having an IP-address as evidence is even weaker than a telephone number, as the majority of US homes have a wireless network nowadays.

"While a decade ago, home wireless networks were nearly non-existent, 61% of US homes now have wireless access. As a result, a single IP address usually supports multiple computer devices – which unlike traditional telephones can be operated simultaneously by different individuals,"

"Different family members, or even visitors, could have performed the alleged downloads. Unless the wireless router has been appropriately secured (and in some cases, even if it has been secured), neighbors or passersby could access the Internet using the IP address assigned to a particular subscriber and download the plaintiff's film."

Here is a quote from Judge Harold Baker's ruling:

"Moreover, VPR ignores the fact that IP subscribers are not necessarily copyright infringers. Carolyn Thompson writes in an MSNBC article of a raid by federal agents on a home that was linked to

6

downloaded child pornography. The identity and location of the subscriber were provided by the ISP. The desktop computer, iPhones, and iPads of the homeowner and his wife were seized in the raid. Federal agents returned the equipment after determining that no one at the home had downloaded the illegal material. Agents eventually traced the downloads to a neighbor who had used multiple IP subscribers' Wi-Fi connections (including a secure connection from the State University of New York). See Carolyn Thompson, Bizarre Pornography Raid Underscores Wi-Fi Privacy Risks (April 25, 2011), http://www.msnbc.msn.com/id/42740201/ns/technology_and_science-wireless/

While it is not possible to know exactly how many of the defendants in these copyright infringement cases based on IP address leases only, are not the individuals who actually downloaded or shared copyrighted materials, in a case in United States District Court Southern District of New York (Case 1:12-cv-00126-AJN Document 6) plaintiff's counsel estimated that "30% of the names turned over by ISPs are not those of individuals who actually downloaded or shared copyrighted material."

"The Court is concerned about the possibility that many of the names and addresses produced in response to Plaintiffs discovery request will not in fact be those of the individuals who downloaded "My Little Panties #2." The risk is not purely speculative; Plaintiff's counsel estimated that 30% of the names turned over by ISPs are not those of individuals who actually downloaded or shared copyrighted material." If plaintiff's counsel in that case estimated such a high number it is more than likely that the actual number is much higher

**IV. Any computer device connected to the internet is inherently unsafe and vulnerable to attacks allowing remote attackers to perform any computer function not authorized by the device owner.**

Just in the last few weeks several high profile security breaches were reported by the media, including the attack on Adobe Corporation and three major U.S. data providers, for example.

On October 3rd CNN reported that hackers accessed personal data for nearly 3 million of Adobe customers and took source code for a number of Adobe products. Adobe's chief security officer wrote that "The attackers removed from our systems certain information relating to 2.9 million Adobe customers, including customer names, encrypted credit or debit card numbers, expiration dates, and other information relating to customer orders" (**Exhibit D**).

On September 25th Reuters reported that hackers placed malicious software on servers at LexisNexis[4] in April 2013 suggesting that the attackers had access to its internal networks for at least five months allowing hackers to steal social security numbers, birthdates and other sensitive personal data of U.S. residents. According to the report "Five hacked servers were identified by examining the web interface used to control the botnet. Two of them were inside LexisNexis, two at D&B[5], and one at Kroll Background America[6] (**Exhibit E**).

Considering that corporations would very much like to keep these security breaches out of the media[7] and that according to the cyber security survey of large corporations and government agencies, published by Computer Security Institute, which conducted the survey with the FBI's San Francisco computer crime squad, "90 percent of respondents detected computer security breaches in the past year" but only a third of all breaches are actually reported (**Exhibit F**), it means that successful hacking attacks on large corporations and government agencies resulting in security breaches are very frequent and under reported.

---

[4] LexisNexis Group is a corporation providing computer-assisted legal research services.
[5] Dun & Bradstreet, Inc. is an American public company headquartered in Millburn, New Jersey, that licenses information on businesses and corporations for use in credit decisions, business-to-business marketing and supply chain management.
[6] Altegrity Risk International (ARI) is a New York City based global risk consulting and information Services Company. A subsidiary of Altegrity, Inc. of Falls Church, VA, ARI provides investigations, business intelligence, forensic accounting, compliance & monitoring and security services to businesses and government agencies around the world.
[7] "There is much more illegal and unauthorized activity going on in cyberspace than corporations admit to their clients, stockholders and business partners or report to law enforcement," said Patrice Rapalus, director of the Computer Security Institute, which conducted the survey with the FBI's San Francisco computer crime squad.

An alarming number of critical operating system vulnerabilities are detected by Microsoft each year (**Exhibit G**) in different versions of their home operating system Microsoft Windows used by the vast majority of home users and the defendant. All these vulnerabilities are described by Microsoft with the same language: "A security issue has been identified that could allow an unauthenticated remote attacker to compromise your system and gain control over it." As disturbing as it is to learn that prior to those discoveries and the security patch releases a remote attacker was in position to use this "security issue" to gain control of our computer systems we use to store sensitive private information, it raises even more important questions: How many of these critical vulnerabilities discovered and patched by Microsoft are discovered and used by the hackers before they are discovered and patched by Microsoft? What is the number of critical operating system vulnerabilities discovered and abused by hackers before they are even known to Microsoft? While it is not possible to answer these questions accurately, judging by the many millions of computers infected and used by hackers for illegal activity in so called botnets (**Exhibit H**) these vulnerabilities are widely used by the hackers.

According to the latest Microsoft Security Intelligence Report (Vol. 14, page 37, **Exhibit I**) malicious software infection rates in United States in 2012 were as follows: Quarter 1: 9,407,423; Quarter 2: 12,474,127; Quarter 3: 9,647,906; Quarter 4: 8,959,660. These infection rates are obtained using "The telemetry data generated by Microsoft security products from computers whose administrators or users choose to opt in to provide data to Microsoft" which means that these infection rates are actually higher than reported in this report considering that not all users choose to opt in to provide data to Microsoft.

All these facts about cyber security and computer system vulnerabilities raise a very important question very much relevant to this case: If computer systems used by multi-billion dollar corporations

and government agencies with dedicated security teams and effectively unlimited security budgets are that easily breached into, if our operating systems contain an unknown number of vulnerabilities "that could allow an unauthenticated remote attacker to compromise your system and gain control over it" as described by the operating system vendor itself, if many millions of computers in United States are currently infected by malicious software,  how can we base lawsuits on assignment of a dynamic, temporary IP address at a certain point in time, as a single piece of evidence, knowing that the home computers and home computer networks could have been very easily breached into by remote attackers? How can we expect home users whose computers are running very vulnerable operating systems with very limited or no knowledge of security issues involving their home computers and networks and no security budget, to have a fully secured home network and be fully responsible for any computer activity or network traffic generated by one or more of their computers without their knowledge?

The defense argues that the answer is that we cannot and should not, and that a dynamic, temporary IP address leased to a particular subscriber at some point in time as a single piece of evidence is therefore clearly insufficient to result in a viable lawsuit and as such is a waste of judicial resources filed with an intent of generating income for plaintiffs through quick settlements and defaults as witnessed by the fact that not a single one of these lawsuits by Malibu Media has ever made it to trial in this court and only one of many hundreds of thousands lawsuits nationwide by various plaintiffs ever did.

## V. Wireless networks are inherently unsafe and vulnerable to attacks

Just as computer systems are easily breached so are the wireless routers we use in our homes to access the internet easier than with traditional wired networks. As reported by CNET[8] in August Wi-Fi routers are plagued by more security risks than ever. According to CNET article "More major brand-name Wi-Fi router vulnerabilities continue to be discovered, and continue to go unpatched, a security researcher has revealed at Defcon 21. Jake Holcomb, a security researcher at the Baltimore, Md.-based firm Independent Security Evaluators and the lead researcher into Wi-Fi router vulnerabilities, said that problem is worse than when ISE released its original findings [http://www.cnet.com /8301-1009_3-57579981-83/top-wi-fi-routers-easy-to-hack-saysbystudy/] in April.

The latest study [http://securityevaluators.com/content/casestudies/routers/soho_service_hacks.jsp] continues to show that the small office and home office Wi-Fi routers are "very vulnerable to attack," Holcomb said." The study (**Exhibit J**) shows that "11 of 13 routers evaluated can be taken over from the WAN" by remote attacker and used by the attacker to utilize the Wi-Fi router's owner internet traffic for any purpose including distribution of copyrighted materials.

## CONCLUSION

Keeping in mind the irrefutable fact that the dynamic IP addresses assigned to home users are temporary and can change at any time, and presented with the official IP history provided by the defendant's ISP, it is clear that the plaintiff will not be able to meet the standard of evidence required for a viable lawsuit. Majority of these facts are very well known to the Plaintiff. It is obvious to the plaintiff that their chance of prevailing in a fair trial with a single piece of evidence which is a

---

[8] http://news.cnet.com/8301-1009_3-57596851-83/wi-fi-routers-more-security-risks-than-ever/

temporary numeric identification that produces an error rate of at least 30%, are slim to none and that is the reason why not a single one of their copyright infringement complaints have ever made it to trial in this court but were instead used as means to squeeze the money out of defendants in what is apparently a business schema not legitimate copyright infringement cases.

For the foregoing reasons, Defendant claims that the Plaintiff's claim(s) must be dismissed because Plaintiff fails to present sufficient facts which, if taken as true, would indicate that any violation of law occurred or that the claimant is entitled to a legal remedy and that consequently Plaintiff's Complaint fails to State a Claim upon which relief may be granted.  Defendant's Motion to Dismiss should therefore be granted.

Wherefore, Defendant respectfully requests that this Court enter an Order:

(A) Dismissing Plaintiff's claim against Defendant in its entirety;

Dated: October 23, 2013

Respectfully submitted,

By: Dean Kuga
Defendant pro se
1146 Yellow Dogwood HTS
Monument, CO 80132
(310) 345-6062

## CERTIFICATE OF SERVICE

I, Dean Kuga, hereby certify that on October 23, 2013, I caused this document to be filed with the Clerk of the Court by US Mail, Priority Delivery with Delivery Confirmation, at the following address:

Clerk's Office
Alfred A. Arraj United States Courthouse
Room A-105
901 19the Street
Denver, Colorado 80294-3589

On the same date, I served a copy of this document upon Plaintiff by mailing the Plaintiff's attorney of record by US Mail, at the following address:

Jason Kotzker, Esq
KOTZKER LAW GROUP
9609 S. University Blvd., #632134
Highlands Ranch, CO 80163

Dean Kuga
Defendant pro se
Dated: October 23, 2013

# Exhibit A

# ENCYCLOPEDIA.

| | SEARCH ENCYCLOPEDIA |

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0-9 MISC

### Definition of: dynamic IP address

A temporary numeric identification assigned to a node in a TCP/IP network. When computers and devices in the network are turned on for the first time, they are assigned an IP address by a DHCP server (see DHCP).

ISPs typically assign dynamic addresses to the Internet connections of their residential and small business customers, which are less expensive than static addresses. That means the IP address to the outside world in a cable or DSL modem may change periodically (see DDNS). Contrast with static IP address. See IP address.



∧Top

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0-9 MISC

EXHIBIT A

# Exhibit B



NE&TO
650 Centerton Road
Moorestown, NJ 08057
866-947-8572 Tel
866-947-5587 Fax

**CONFIDENTIAL**

October 16, 2013

**VIA UPS DELIVERY**

Dean Kuga
1146 Yellow Dogwood Heights
Monument, CO 80132

Re:  Subscriber Request
Comcast File #: **507139-140**

Dear Dean Kuga:

The Subscriber Request received on 10/16/2013 with respect to the above-referenced matter has been forwarded to the Legal Response Center for a reply.  The Subscriber Request asks Comcast to produce certain subscriber account records pertaining to the following IP address used on **05/04/2013 at 16:28:59 GMT: 75.70.54.187.**

Based on the information provided pursuant to the Subscriber Request, the subscriber information obtained has been provided below:

Subscriber Name:       DEAN KUGA
Service Address:        1146 YELLOW DOGWOOD HTS
                        MONUMENT, CO 80132-8557
Telephone Number:      719-505-8474
Type of Service:       High Speed Internet
Account Number:        8497900120225697
E-mail User Ids:       dean.kuga
                        (the above user ID(s) end in @comcast.net)
IP History:            See attached

If you need further assistance, or if you have any questions regarding this matter, please feel free to call 866-947-8572.

Very Truly Yours,

Comcast Legal Response Center

EXHIBIT B

IP History

| IP Address | Lease Grant (UTC) | Lease Expiration (UTC) |
|---|---|---|
| 75.71.234.156 | 07/13/2013 20:45:11 | * |

| IP Address | Lease Grant (UTC) | Lease Expiration (UTC) |
|---|---|---|
| 75.70.54.187 | 04/19/2013 08:53:53 | 07/11/2013 17:09:59 |

**\* Report generated on 10/16/2013 16:33:37** - All times are shown in UTC.

EXHIBIT B

# Exhibit C

# XFINITY Connect

**dean.kuga@comcast.net**

± Font Size -

# Constant Guard Service Alert

**From :** Comcast Online Communications
<online.communications@alerts.comcast.net>

Fri, May 10, 2013 08:18 AM

**Subject :** Constant Guard Service Alert

**To :** dean kuga <dean.kuga@comcast.net>

**Reply To :** online communications
<online.communications@alerts.comcast.net>

**Constant Guard™ Alert**

**Dear XFINITY Customer,**

XFINITY identified one or more of your computers may be infected with a bot. You might have already seen an Alert from XFINITY informing you about bot activity.

**We strongly recommend you <u>take action</u> to remove malicious software from your computers.**

We appreciate your prompt attention to this important security notice.

Sincerely,
Constant Guard from XFINITY

<u>Take Action Now</u>

**What is a bot?**
A bot is a malicious form of software that is used to send spam, host a phishing site, or steal your identity by monitoring your keystrokes without your knowledge.

**1st
Bot infects your computer
2nd
Bot gathers your personal info
3rd
Bot passes your info to 3rd party**

What is Constant Guard from XFINITY?

**Constant Guard is a comprehensive online security protection service provided by XFINITY Internet.**
We help ensure your online safety with products and services to protect you, your computer and your family.

Constant Guard identifies infected computers by:

- Getting data from reputable Internet research groups that specialize in bot identification.
- Looking for malicious behavior exhibited by bots (such as spam, distributed denial of service attacks, and repeated connection requests to known 'command and control' channels).
- Collecting this data to confirm whether one or more of your computers has been infected.

This is a service related email. Comcast will occasionally send you service-related emails to inform you of service upgrades or new benefits to you Comcast

EXHIBIT C

2013-08-17 19:18

High-Speed Internet service.

Copyright 2012. Comcast. All other trademarks are properties of their respective owners.

Comcast respects your privacy. For a complete description of our privacy policy, click here.

Comcast
One Comcast Center, 10th Floor
1701 JFK Boulevard
Philadelphia, PA 19103-2838



EXHIBIT C

2013-08-17 19:18

# Exhibit D

NEW YORK (CNNMoney)

Adobe Systems said Thursday that hackers had accessed personal data for nearly 3 million of its customers.

Brad Arkin, Adobe's chief security officer, wrote in **a blog post** that the hackers had removed data including encrypted credit- and debit-card numbers, but that the company does not believe any decrypted numbers were taken.

The attackers "removed from our systems certain information relating to 2.9 million Adobe (   **ADBE**) customers, including customer names, encrypted credit or debit card numbers, expiration dates, and other information relating to customer orders," Arkin wrote. The company is in the process of notifying customers whose card information was involved in the incident, and is resetting the relevant customer passwords.

The hackers also took source code for a number of Adobe products, Arkin said.

"We're working diligently internally, as well as with external partners and law enforcement, to address the incident," he wrote.

Brian Krebs, author of the respected security blog Krebs on Security, **wrote** that the attackers appeared to be the same group responsible for attacks earlier this year on data aggregators LexisNexis, Kroll and Dun & Bradstreet. ∎

First Published: October 3, 2013: 6:00 PM ET

EXHIBIT D

# Exhibit E

# Databases Breached: LexisNexis, Altegrity And Dun & Bradstreet Corp Report Cyber Attacks

**Reuters** | By Jim Finkle
Posted: 09/25/2013 10:06 pm EDT | Updated: 09/26/2013 11:31 am EDT

**REUTERS**        BOSTON (Reuters) - Three major U.S. data providers said on Wednesday they were victims of cyber attacks, after a cybersecurity news website linked the breaches to a group that sells stolen social security numbers and other sensitive information.

An FBI spokeswoman said the bureau was investing the breaches but declined to elaborate.

The disclosures, by Dun & Bradstreet Corp, Altegrity Inc's Kroll Background America Inc and Reed Elsevier's LexisNexis Inc, came after website KrebsOnSecurity first reported the breaches.

The site said the attacks were masterminded by a cybercrime ring that sold stolen data such as credit reports through the website ssndob.ms, or SSNDOB.

The ring offered social security numbers, birthdays and other personal data of U.S. residents for between 50 cents and $2.50 per record, KrebsOnSecurity reported. Credit reports and background checks cost between $5 and $15, the cybersecurity site reported after a seven-month investigation into SSNDOB.

KrebsOnSecurity said the group placed malicious software on servers at LexisNexis as early as April 2013, suggesting that the attackers had access to its internal networks for at least five months.

SSNDOB administrators operated a small botnet, or group of infected computers remotely controlled by hackers, that was in direct communication with computers inside several large U.S. data brokers, the KrebsOnSecurity report said.

Five hacked servers were identified by examining the web interface used to control the botnet. Two of them were inside LexisNexis, two at D&B, and one at Kroll Background America.

"There are grave implications here from a privacy perspective," said Alex Holden, a cyber forensics expert who served as a consultant to the publication during the investigation.

Two of the victims declined to comment on the potential theft of data, saying they were investigating the attacks to find out exactly what happened. A third, LexisNexis, said it has so far found no evidence of theft.

"To date (we) have found no evidence that customer or consumer data were reached or retrieved," a LexisNexis representative said in a statement.

D&B spokeswoman Michele Caselnova said her firm was "aggressively investigating" the attack.

"Data security is a company priority and we are devoting all resources necessary to ensure that security," she said.

Kroll Background America spokesman Ray Howell said the company was working with external forensics experts to investigate the source and "impact, if any," of malicious software found on web servers at a Nashville, Tennessee data center.

(Reporting by Jim Finkle; Editing by Edwin Chan and Stephen Coates)

EXHIBIT E

# Exhibit F

# Many Hack Attacks Go Unreported

• [Comment] ? Shares ? Tweets ? Stumble ? [Email]

• More + Most large corporations and government agencies have been attacked by computer hackers, but they frequently do not inform authorities of the breaches, an FBI survey finds.

The survey released Sunday found about 90 percent of respondents detected computer security breaches in the past year but only 34 percent reported those attacks to authorities.

Many respondents cited the fear of bad publicity about computer security.

"There is much more illegal and unauthorized activity going on in cyberspace than corporations admit to their clients, stockholders and business partners or report to law enforcement," said Patrice Rapalus, director of the Computer Security Institute, which conducted the survey with the FBI's San Francisco computer crime squad.

The seventh annual survey polled 503 American corporations, government agencies, financial and medical institutions and universities. The names of the organizations polled were not released.

Overall, there were more computer crimes than in last year's survey. But fewer victims reported crimes to police than in 2001, reversing a trend from earlier surveys.

A former Justice Department computer crimes prosecutor said there is frequently little incentive for a company to report computer attacks or crimes.

"It tends not to help their bottom line, but hurt their bottom line," Mark Rasch said. "What a company wants to do is solve the problem and move on."

When those companies are financial institutions or other parts of the nation's critical technology infrastructure, however, more than the company's bottom line is at stake.

The government is using partnership groups - such as the FBI's InfraGard chapters in each field office - to persuade companies to report the attacks directly to FBI agents without public disclosure.

"They need to use a mechanism to report these incidents and vulnerabilities broadly so they can be fixed, but won't be attributable back to them," Rasch said.

The survey respondents said they lost at least $455 million as a result of computer crime, compared with $377 million the previous year. In both surveys, only about half chose to quantify their losses.

The most serious monetary losses came from the theft of money or proprietary information, such as blueprints for computer programs, and fraud, such as failure to deliver services or equipment that have been paid for.

Despite concerns that foreign governments would begin using computer attacks as a method of terrorism or war, most attacks on American companies still come from individual hackers and disgruntled employees, the report said.

The survey also addresses the increasing frequency of attacks on Internet retailers. There have been several reports of thefts of credit card data over the past year, including some instances in which the thief threatened to release sensitive data unless the victim paid a ransom.

WorldCom, The New York Times and others have had holes exposed in their Web security, leading to unwanted intruders.

Thirty-eight percent of the respondents said their Web sites have been broken into over the past year, and 21 percent said they were not sure. Eighteen percent reported some sort of theft of transaction information, such as credit card numbers or customer data, or financial fraud.

Seventy percent of organizations reported online graffiti, usually the simplest and least damaging type of attack. A graffiti hacker replaces the Web site's front page with his or her own text and, sometimes, offensive pictures.

Companies are also seeing problems from within. Seventy-eight percent said their employees abused Internet privileges, including downloading pornography or pirated software.

by D. Ian Hopper

© 2009 The Associated Press. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed.

2

EXHIBIT F

# Exhibit G



FIGURE 11: CVEs IN TOP 50

FIGURE 12: CVEs IN TOP 50





FIGURE 13: CVEs IN TOP 50

| Breakdown of end-point vulnerabilities in 2012 | WinXP | WinVista | Win7 |
|---|---|---|---|
| Operating System | 48 | 49 | 51 |
| Microsoft Programs | 77 | 77 | 77 |
| Third-Party Programs | 792 | 792 | 792 |
| **Total** | **917** | **918** | **920** |

EXHIBIT G

# Exhibit H

# Bots and Botnets—A Growing Threat

**Bots are one of the most sophisticated and popular types of cybercrime today. They allow hackers to take control of many computers at a time, and turn them into "zombie" computers, which operate as part of a powerful "botnet" to spread viruses, generate spam, and commit other types of online crime and fraud.**

Podcast: Discussion on bots and botnets with Marian Merritt



## What is a Bot?

A "bot" is a type of malware that allows an attacker to take control over an affected computer. Also known as "Web robots", bots are usually part of a network of infected machines, known as a "botnet", which is typically made up of victim machines that stretch across the globe

Since a bot infected computer does the bidding of its master, many people refer to these victim machines as "zombies." The cybercriminals that control these bots are called botherders or botmasters.

Some botnets might have a few hundred or a couple thousand computers, but others have tens and even hundreds of thousands of zombies at their disposal. Many of these computers are infected without their owners' knowledge. Some possible warning signs? A bot might cause your computer to slow down, display mysterious messages, or even crash.

## How Bots Work

Bots sneak onto a person's computer in many ways. Bots often spread themselves across the Internet by searching for vulnerable, unprotected computers to infect. When they find an exposed computer, they quickly infect the machine and then report back to their master. Their goal is then to stay hidden until they are instructed to carry out a task.

After a computer is taken over by a bot, it can be used to carry out a variety of automated tasks, including the following:

EXHIBIT H

# Exhibit I

# Malware and potentially unwanted software

Except where specified, the information in this section was compiled from telemetry data that was generated from more than 1 billion computers worldwide and some of the busiest services on the Internet. (See "Appendix B: Data sources" on page 87 for more information about the telemetry used in this report.)

## Global infection rates

The telemetry data generated by Microsoft security products from computers whose administrators or users choose to opt in to provide data to Microsoft includes information about the location of the computer, as determined by IP geolocation. This data makes it possible to compare infection rates, patterns, and trends in different locations around the world.[4]

Figure 17. Trends for the locations with the most computers reporting detections and removals by Microsoft desktop antimalware products in 2H12

| | Country or region | 1Q12 | 2Q12 | 3Q12 | 4Q12 | Chg. 1H–2H |
|---|---|---|---|---|---|---|
| | | | | | | |
| 2 | Brazil | 3,715,163 | 3,333,429 | 3,528,282 | 4,458,573 | 13.3% ▲ |
| | | | | | | |
| 4 | Russia | 2,580,673 | 2,510,591 | 2,294,438 | 2,505,561 | -5.7% ▼ |
| | | | | | | |
| 6 | China | 1,889,392 | 2,000,576 | 1,917,106 | 1,770,264 | -5.2% ▼ |
| | | | | | | |
| 8 | Germany | 1,544,774 | 1,486,309 | 1,561,074 | 1,586,739 | 3.9% ▲ |
| | | | | | | |
| 10 | United Kingdom | 1,648,801 | 1,509,488 | 1,460,015 | 1,516,078 | -5.8% ▼ |

---

[4] For more information about this process, see the entry "Determining the Geolocation of Systems Infected with Malware" (November 15, 2011) on the Microsoft Security Blog (blogs.technet.com/security).

EXHIBIT 1

# Exhibit J

Speak with our analysts today at 1.443.270.2296



| Why ISE | Security Evaluation | System Design | Litigation Consulting | Publications | Contact | News |

Independent security evaluators

Case Studies

HTTPS Vulnerabilities

Exploiting Routers

Exploiting Android

Exploiting Age of Conan

Exploiting SecondLife

Exploiting the iPhone

Exploiting RFIDs

# Exploiting SOHO Routers

**NEW:** We have posted an **additional study** of security vulnerabilities in extraneous, non-router services running on SOHO routers.

Learn more about this on CNET's article on our router hacks and its accompanying video.

For more information on this routers project, you can contact us at routers@securityevaluators.com Alternatively, click here to contact ISE regarding general inquiries about the company.

## Introduction

ISE researchers have discovered critical security vulnerabilities in numerous small office/home office (SOHO) routers and wireless access points. We define a critical security vulnerability in a router as one that allows a remote attacker to take full control of the router's configuration settings, or one that allows a local attacker to bypass authentication and take control. This control allows an attacker to intercept and modify network traffic as it enters and leaves the network.

> **All 13 routers evaluated can be taken over from the local network**
>   4 of these attacks require no active management session.
>
> **11 of 13 routers evaluated can be taken over from the WAN**
>   2 of these attacks require no active management session.

**Motivation**

Despite being widely distributed and deployed in nearly every modern home and small office, SOHO networking equipment has received surprisingly little attention from security researchers. Yet, these devices facilitate the connectivity and protection (we hope) of millions of end-systems. The **critical** vulnerabilities that persist in these widely used devices demonstrate an urgent need for deeper scrutiny.

ISE initially set out to evaluate the security of ten popular, off-the-shelf SOHO wireless routers. The final scope of the research project was expanded to include thirteen unique devices. Our research indicates that a moderately skilled adversary with LAN or WLAN access can exploit all thirteen routers. We also found that **nearly all devices** had **critical security vulnerabilities** that could be exploited by a remote adversary, resulting in router compromise and unauthorized remote control. At least half of the routers that provided network attached storage (NAS) were found to be accessible by a remote adversary (full details will be disclosed in a future article).

We further categorize these remotely and locally accessible vulnerabilities by indicating their associated attack requirements:

*Trivial attacks* can be launched directly against the router with no human interaction or access to credentials.

*Unauthenticated attacks* require some form of human interaction, such as following a malicious link or browsing to an unsafe page, but do not require an active session or access to credentials.

*Authenticated attacks* require that the attacker have access to credentials (or that default router credentials are used—an all-too-common situation) or that a victim is logged in with an active session at the time of the attack.

EXHIBIT J

We considered client-side attacks to be in scope, so long as they consist entirely of HTML and JavaScript code running in a web browser.

## Summary

| Router | Remote Adversary | | | Local Adversary | | |
|---|---|---|---|---|---|---|
| | Trivial | Unauthenticated | Authenticated | Trivial | Unauthenticated | Authenticated |
| Linksys WRT310Nv2 | | | X | | | X |
| Belkin F5D8236-4 v2 | | | X | | | X |
| Belkin N300 | | X | X | X | X | X |
| Belkin N900 | | X | X | X | X | X |
| Netgear WNDR4700 | | | | X | X | X |
| TP-Link WR1043N | | | X | | | X |
| Verizon Actiontec | | | X | | | X |
| D-Link DIR-865L | | | X | | | X |
| ASUS RT-N56U | | | X | | | X |
| ASUS RT-AC66U | | | X | | | X |
| Linksys EA6500 | | | | | | X |
| Netgear WNR3500 | | | X | X | X | X |
| TRENDnet TEW-812DRU | | | X | | | X |

## Important notes

**Disclaimer.** ISE did not exhaustively evaluate these routers, and in no way asserts that other product vulnerabilities do not exist. Many of these routers enable by default—or provide the capability to enable—telnet, ftp, and other services that have not been fully investigated. Our research was directed at assessing the ubiquity of these vulnerabilities, and not the number of issues present in any specific router model, or through any particular service or form of attack.

**Remote services.** None of the routers evaluated enabled remote administration by default, or any remote services . However, this option is available to administrators, and if enabled, drastically increases the router's exploitability in each case. ISE recommends administrators not enable remote administration, or remote services under any circumstances.

**Remote compromise definition.** We define remote compromise as full control of a router at the operating-system level by an adversary inside or outside of the router's domain.

**Fully updated.** Prior to our evaluation, all routers were updated to the latest firmware, and tested with out-of-the-box configuration settings.

## Impact; new threats

SOHO router vulnerabilities impact consumers in a number of ways that differ from the vulnerabilities that typically afflict end-systems, and through those vulnerabilities new threats arise. The number of parties affected by an individual or widespread router compromise is expanded, there could be lasting damage to users or soho networking device vendors, and detecting or recovering from an exploit of this type can be difficult.

### Affected parties: who is the victim?

A typical end-system compromise pegs the end-user as the victim. Certainly, advanced threats leverage end-system compromise to gain a network foothold and attempt to compromise lateral systems, but in general there is one victim, and one party responsible for cleaning up the mess.

EXHIBIT J

A SOHO router compromise not only affects that device, but the many end-systems it supports, the infrastructure of which it is a part, the community of sites visited by the end-users, and even the soho networking device vendor.

## Implications

The impact of these routers' security flaws is exacerbated by the fact that unauthenticated attacks can target not only the administrator of a victim router's (W)LAN, but *any* user on the (W)LAN. A parent or child in the case of the home, any or all students behind a university router, or any guest or untrained user of a small office or enterprise network can be targeted and leveraged to gain full control of the SOHO networking device, which may also lead to additional attacks being launched against other users.

## Significance of compromise

Once compromised, any router—SOHO or otherwise—may be used by an adversary to secure a man-in-the-middle position for launching more sophisticated attacks against all users in the router's domain. This includes sniffing and rerouting all non-SSL protected traffic, poisoning DNS resolvers, performing denial of service attacks, or impersonating servers. Worse still, is that these routers are also firewalls, and often represent the first (and last) line of defense for protecting the local network. Once compromised, the adversary has unfettered access to exploit the vulnerabilities of local area hosts that would be otherwise unreachable if the router were enforcing firewall rules as intended.

## Difficult Recovery; Persistent issue

The overall community impact could be much worse. Considering that many soho networking device administrators are not computer or security savvy, default settings are undoubtedly prevalent. Even in the case where the vulnerabilities identified here and elsewhere are addressed by the vendor, it may not be reasonable to expect that SOHO networking device owners know about these issues, or will upgrade/patch their routers' firmware, which is the predominant distribution mechanism for SOHO networking device updates. In such cases, the vulnerabilities may remain unresolved indefinitely.

"Bricking" of SOHO networking devices could also become an issue due to the cumbersome and unauthenticated nature of the firmware upgrade process. As we've identified, in all routers evaluated a remote adversary can replace a vendor's firmware with their own. If such firmware were (intentionally) faulty, it could render a device unusable. The damage to users and vendors could be significant depending upon the number of devices in the field, the rate at which they can be compromised or "bricked," and the cost to replace or repair them.

## Large-scale threats

So far we have acknowledged that users belonging to an affected router's domains are at risk, but if any ISP deploys a router at scale with these types of vulnerabilities—or has many customers using routers with these types of vulnerabilities—an adversary may leverage the vulnerabilities to directly attack the provider, core infrastructure, or other organizational targets, e.g., corporations and nation-states. This also presents a large surface for new botnet deployment or command and control (C2) strategies to facilitate DDoS attacks and cybercrime activities.

# Mitigations

Unfortunately, there is little the average end-user can do to fully mitigate these attacks. Successful mitigation often requires a level of sophistication and skill beyond that of the average user (and beyond that of the most likely victims).

## Recommendations for Vendors

SOHO networking device VENDORS should take the following actions to help mitigate these issues.

Prepare and make available firmware upgrades that address these issues.

Notify registered users of these vulnerabilities, and distribute instructions on how to upgrade device firmware.

Regularly audit devices for security vulnerabilities, produce and distribute security patches in a timely manner, and notify registered customers.

EXHIBIT J

SOHO networking device VENDORS should incorporate the following design changes in to their product lines.

Using authenticated (digitally signed, and verifiable by the router) firmware updates.

Designing a method for automatic firmware updates, that can be opted out of by users.

Perform regular security audits to ensure devices are as hardened as possible.

### Recommendations for Device Administrators

SOHO networking device ADMINISTRATORS should take the following actions to help mitigate these issues.

Upgrade your firmware regularly.

Disable (or do not enable) remote administration.

Disable (or do not enable) network services that are not utilized within the LAN, e.g., FTP, SMB, UPnP.

Log out from, and restart, your SOHO networking device after logging in for administrative tasks.

Clear browser cookies and active logins after logging out from your router.

Choose a non-standard (W)LAN IP address range (subnet), which will make generic automated attacks less effective against your network.

If possible, enable HTTPS for all administrative connections. For all of the routers we evaluated that had this feature, it was disabled by default.

Make sure your WLAN is protected using WPA2 encryption and is not left as an open WiFi network or protected with the outdated WPA or WEP standards.

ONLY install firmware from the router manufacturers website.

Choose a secure router administration password consisting of upper/lowercase alphanumeric and special characters that is at least 12 characters in length.

If your SOHO device is behind an additional firewall, restrict inbound access to this device from the greater WAN.

### Recommendations for End Users

END-USERS behind SOHO networking devices should take the following actions to help mitigate these issues.

Do not discount browser or other software warnings of potential MITM attacks.

Do not follow links sent through email or by other means, especially ones that are directed to what could potentially be a SOHO networking device (e.g., 192.168.2.1).

Be diligent, and browse safely.

## Disclosures

For all vulnerabilities identified in this research, ISE has disclosed the issues to the product vendors through their typical vulnerability reporting mechanism, as well as any other channels for which we had access. We've given what we believe is adequate time to address the issues disclosed, and to the extent it has been reasonable, we've helped those vendors develop or implement mitigations. We welcome all vendor feedback, and are happy to assist with any additional information that may facilitate a quick resolution to any of these vulnerabilities.

Beyond the vulnerabilities listed in this case study, our research has brought to light 17 issues that have received Common Vulnerabilities and Exposure (CVE) numbers, and 21 CVE submissions pending.

CVE-2013-0126: Cross-Site Request Forgery

CVE-2013-2644: FTP Directory Traversal

EXHIBIT J

CVE-2013-2645: Cross-Site Request Forgery

CVE-2013-2646: Denial of Service

CVE-2013-3064: Unvalidated URL Redirect

CVE-2013-3065: DOM Cross-Site Scripting

CVE-2013-3066: Information Disclosure

CVE-2013-3067: Cross-Site Scripting

CVE-2013-3068: Cross-Site Request Forgery

CVE-2013-3069: Cross-Site Scripting

CVE-2013-3070: Information Disclosure

CVE-2013-3071: Authentication Bypass

CVE-2013-3072: Unauthenticated Hardware Linking

CVE-2013-3073: SMB Symlink Traversal

CVE-2013-3074: Media Server Denial of Service

CVE-2013-3083: Cross-Site Request Forgery

CVE-2013-3084: Cross-Site Scripting

CVE-2013-3085: Authentication Bypass

CVE-2013-3086: Cross-Site Request Forgery

CVE-2013-3087: Cross-Site Scripting

CVE-2013-3088: Authentication Bypass

CVE-2013-3089: Cross-Site Request Forgery

CVE-2013-3090: Cross-Site Scripting

CVE-2013-3091: Authentication Bypass

CVE-2013-3092: Failure to Validate HTTP Authorization Header

CVE-2013-3095: Cross-Site Request Forgery

CVE-2013-3096: Unauthenticated Hardware Linking

CVE-2013-3097: Cross-Site Scripting

## Related Work

As stated earlier in this article, there has been little research published in the area of SOHO router security, however some interesting results have been disclosed by security researchers in recent years.

In March, 2013, Michael Messner disclosed vulnerabilities ranging from minor to critical in D-Link, TP-Link, Netgear, and Linksys routers. The vulnerabilities disclosed included authenticated and unauthenticated arbitrary command injection, information disclosure, unencrypted password storage, directory traversal, and persistent cross-site scripting.

In January, 2013, HD Moore disclosed that numerous home routers exposed UPnP services, including SSDP Discovery and SOAP, to the Internet (WAN) side of the device. This could lead to remote attackers modifying firewall rules or accessing private media files using DLNA. Worse, many of the UPnP implementations had numerous buffer overflow vulnerabilities.

Also in January, 2013, DefenseCode released an advisory describing a remote, unauthenticated format string vulnerability in the Broadcom UPnP software that escalated to root shell access.

EXHIBIT J